ELVIN ASSOCIATES, Plaintiff,

v.

Aretha FRANKLIN and Crown Productions, Inc., Defendants.

No. 85 Civ. 5723 (WK).

United States District Court, S.D. New York.

March 1, 1988.

Jay D. Kramer, New York City, for plaintiff.

Thomas S. Howard, Thacher, Profitt & Wood, New York City, for defendants.

WHITMAN KNAPP, District Judge.

In this action, plaintiff Elvin Associates, whose principal is Ashton Springer,[1] alleg-

---

1. Defendants allege that Elvin Associates is merely a d/b/a name for Springer and that no factual distinction exists between Elvin Associates and Springer. Since plaintiff has conceded this point for the purposes of the motions now before this court, we shall at times refer to plaintiff as "Springer."

es that defendants Aretha Franklin and Crown Productions, Inc. breached a contract under which Franklin was to star in a New York musical production entitled "Sing Mahalia Sing" ("Mahalia"), which plaintiff was to produce and manage. Defendants have denied that they entered into the contract upon which plaintiff is suing and have asserted a counterclaim alleging breach by plaintiff of a second contract relating to the same production.

The case is before us on defendants' motion (a) for leave to amend their answer to assert as an affirmative defense that the alleged contract, even if proven, would be unenforceable as against public policy, and (b) for summary judgment dismissing the complaint on the basis of that defense.[2] For the reasons stated below, we deny leave to amend, and, of necessity, summary judgment. Plaintiff's cross-motion for summary judgment dismissing the counterclaim due to the lack of factual basis for the damages alleged on that claim is also denied.[3]

## BACKGROUND

The facts pertaining to defendants' instant motions are that on or about September 22, 1982, the Attorney General of the State of New York brought suit against Springer alleging that he had engaged in unlawful and fraudulent activities with respect to the handling of funds invested by former limited partners in his production of the musical "Eubie." Springer responded by consenting to the entry of a judgment of permanent injunction and by agreeing to make an offer of full restitution of $123,-745.95 to his former limited partners in "Eubie." The judgment was entered in the Supreme Court, New York County, on September 27, 1982, stating that its purpose was to permanently enjoin and restrain Springer from the

issuance, offering for sale, sale, promotion, negotiation, advertisement and distribution of syndication interests in any theatrical production to the public within and from the State of New York pursuant to Article 26–A of the General Business Law of this State.

The judgment provides, *inter alia*, that Springer

"is restrained and enjoined permanently from directly or indirectly engaging or attempting to engage in the issuance, offering for sale, sale, promotion, negotiation, advertising and distribution of any offering of syndication interests in any live-staged dramatic plays or dramatic musical production which hereafter are intended to be shown to the public for profit, and are financed wholly or in part by the offering or sale in or from this State, directly or through agents or distributors, of investment agreements, evidences of interest, limited partnerships, producer's shares, equity or debt securities, pre-organization subscriptions or any other syndication participation when any persons are offered, solicited to purchase or sold directly or indirectly such syndication interests for money or services within or from the State of New York unless and until [Springer has] complied with Article 26–A of the General Business Law including the filing of certified

---

2. Defendants move alternatively for partial summary judgment dismissing plaintiff's second and third causes of action on the ground that they are without factual foundation. Plaintiff alleges as its second and third causes of action, respectively, that defendants engaged in a scheme to defraud plaintiff by failing to appear for rehearsals and that plaintiff is entitled to punitive damages because defendants' alleged breach of contract was "wanton, willful and malicious." At oral argument, plaintiff indicated a willingness to withdraw those causes of action, but has not yet done so. In the absence of such withdrawal, we grant defendants' motion for partial summary judgment dismissing plaintiff's second and third causes of action.

3. In support of this motion, plaintiff has excerpted a portion of defendant Franklin's deposition testimony which shows her lack of comprehension of the means by which the damages alleged under the counterclaim were calculated. Plaintiff has neither sufficiently demonstrated a degree of uncertainty of damages that might warrant summary judgment, nor provided support for the proposition that a party's unfamiliarity with the method used by her counsel to calculate alleged contract damages entitles the other party to summary judgment on a contract claim. The motion must therefore be denied.

financial statements with the Department of Law for 'Daddy Goodness,' and 'Whoopee' within one year from the entry of this Judgment; and ... that [Springer shall] make an offer of full restitution to all investors in the Eubie Company who have not executed a waiver of their right to receive full restitution ..." *Id.*

Defendants contend that Springer's plan for financing the production of "Mahalia" violated the September 1982 injunction. Defendants claim that, notwithstanding the injunction, Springer sought to finance the musical show at issue in this action ("Mahalia") by soliciting funds from potential limited partner investors throughout the country, including the Nederlander Organization, Irwin Meyer, Steven Friedman, Ronald Avis, Sam L'Hommedieu, Greg Reed and Moe Septee. They assert that Springer circulated an investment agreement in the form of a proposed Limited Partnership Agreement to most of the prospective investors, seeking a capitalization of $500,000–$600,000. They further contend that Springer spent approximately $93,000 of his own money on the production of "Mahalia," instead of paying restitution to the "Eubie" investors, and that he failed to make the filings called for by the consent judgement.

Plaintiff admits that he has not entirely complied with all the requirements of the injunction, but denies that his financing of "Mahalia" violated the injunction. Plaintiff first argues that the correct interpretation of the injunction is that it only prevents him from attempting to solicit funds from "the public." He claims he is permitted under the terms of the decree to finance a theatrical production with his own funds or those of private investors. In support of this claim, plaintiff argues that the safeguard and enforcement provisions of Article 26–A of the General Business Law and its successor statute Article 23 of the Arts and Cultural Affairs Law of New York are intended to protect members of the general public who lack the expertise and familiarity the entertainment industry necessary to evaluate the risks inherent in investing in legitimate stage productions.

Plaintiff further contends that he did not finance "Mahalia" with funds solicited from the public, but instead sought financing entirely from sources within the entertainment industry who were to co-produce "Mahalia" with him. These sources included Irwin Meyer and Steven Friedman, who are experienced Broadway producers of such productions as "Annie," and the Nederlander Organization, which owns or controls legitimate state theatres throughout the United States and which co-produced "La Cage Aux Folles." Plaintiff also intended to approach for funds local promoters or presenters in other cities who would also be co-producers, including Sam L'Hommedieu, Moe Septee and Greg Read. In addition, plaintiff claims he borrowed money from various private sources in order to keep the production of "Mahalia" going.

At oral argument, it was learned that the Attorney General of the State of New York has been alerted by defendants to plaintiff's conduct in financing "Mahalia," and that the Attorney General has thus far taken no steps to bring contempt proceedings against Springer.

## DISCUSSION

Defendants assert that the contract Springer alleges to have entered into with Franklin is unenforceable as against public policy, because his ability to perform the contract depended upon his violation of the injunction. Defendants rely primarily on *Reiner v. North American Newspaper Alliance* (1932) 259 N.Y. 250, 181 N.E. 561, the so-called "Graf Zeppelin" case, in arguing that a court may not aid a wrongdoer or lawbreaker by enabling him to recover on a contract that derives from or depends upon his unlawful conduct. In *Reiner*, plaintiff sued to obtain payment for news dispatches he had sent during the Graf Zeppelin's first transatlantic voyage. However, by contracting to send those dispatches, plaintiff had knowingly violated a third party's exclusive right to transmit news reports from the zeppelin. Plaintiff had also violated an express condition of his passage, namely, that he refrain from

wiring news dispatches during the voyage. The court found that "the contract in issue resulted from, was directly connected with, and was entered into" in furtherance of an unlawful scheme, and held the contract unenforceable. Defendants also rely on *Anabas Export Ltd. v. Alper Industries* (S.D. N.Y.1985) 603 F.Supp. 1275, and on *McConnell v. Commonwealth Pictures Corp.* (1960) 7 N.Y.2d 465, 199 N.Y.S.2d 483, 166 N.E.2d 494. The essence of defendants' argument from this case law is that plaintiff is unable to prove that he could have performed under the alleged contract—an essential component of his burden—without using funds gathered in violation of the injunction, and that enforcement of the contract would thus involve countenancing unlawful conduct on plaintiff's part, in contravention of public policy.

Defendant's assertion of a defense by analogy to these cases is, however, faulty. In *Reiner* and its progeny, the plaintiff's conduct involved indisputably unlawful conduct: either the contracts themselves directly violated a third party's rights, *Reiner, supra; Anabas, supra,* or the plaintiff obtained an otherwise lawful contract by committing a crime, *McConnell, supra.* The only issue necessary for those courts to determine was whether such clearly unlawful conduct on plaintiff's part barred recovery on the contract. By contrast, where consideration of the defense of illegality would involve the Court in admitting "potentially extensive, confusing and prejudicial evidence," it is within the Court's discretion to disallow such an inquiry. *Contemporary Mission, Inc. v. Bonded Mailings, Inc.* (2d Cir.1982) 671 F.2d 81, 83.

In the case at bar, the alleged contract itself violates no third party's rights, because Springer's entry into the alleged contract with defendants did not of itself violate the injunction. Furthermore, in performing under the contract, Springer did not engage in plain or undisputed illegality. Neither the correct interpretation of the injunction's provisions, nor the lawfulness of the plaintiff's activities in gathering financing for "Mahalia" are clear. Resolution of these issues would involve a commitment of extensive judicial resources to collateral and potentially prejudicial inquiries.

Moreover, even if it were clear that Springer had violated the injunction in assembling his financing, we would still bar this affirmative defense as inappropriate. It is significant that in response to a question posed at oral argument of these motions, defendants responded by letter that they had been unable to locate "any case in which a court had ruled a contract unenforceable as against public policy because it derived from or depended upon the promisee's contempt of a court order." Letter of Thomas S. Howard, November 12, 1987. The absence of such precedent is not surprising. It is primarily the province of the party in whose favor an order is entered—here, the Attorney General of the State of New York—to determine what, if any, remedies to pursue in response to a perceived violation of such order.

In our view, a federal jury trial is not an appropriate forum for determining whether or not any actions by plaintiff in carrying out the alleged contract intentionally or unintentionally violated an injunction issued by the New York Supreme Court and, if so, what sanctions should be applied. Such a determination should be made by the court that issued the injunction upon application of the Attorney General of the State of New York. It seems to us that, assuming the New York Supreme Court should find the injunction to have been violated, it could react in at least three possible fashions: (a) it might conclude that the violation did not call for sanctions at this time; (b) it might enjoin the plaintiff from pursuing the instant law suit; or on the other hand (c) it might direct the plaintiff to vigorously pursue this action and to use all or some of its proceeds to make restitution to investors in the earlier production. It would be inappropriate for us to preclude the first or last possibility.

## CONCLUSION

Defendants' motion for leave to amend their answer to assert an additional affirm-

 

ative defense and for summary judgement on that defense is denied. Defendants' motion for partial summary judgment dismissing counts two and three of the complaint is granted. Plaintiff's cross-motion to dismiss the counterclaim is denied.

SO ORDERED.